**UNITED STATES of America, Plaintiff,**

**v.**

**Alfred CARPENTIER and Alexander Alexandro, Defendants.**

**No. CR–80–00120.**

United States District Court,
E. D. New York.

Nov. 25, 1981.

John H. Jacobs and Thomas P. Puccio, U. S. Dept. of Justice, Organized Crime Strike Force, Laura Brevetti, Sp. Asst. U. S. Atty., Brooklyn, N.Y. for Edward R. Korman, U. S. Atty., E. D. N. Y.

James Pascarella, Carle Place, N. Y. for the defendant Alfred Carpentier.

Debevoise & Plimpton, and Katharine P. Darrow, New York City, for applicant New York Times Co.

Patterson, Belknap, Webb & Tyler, New York City, for applicant New York News, Inc.

## MEMORANDUM OF DECISION AND ORDER

COSTANTINO, District Judge.

This is a motion by the Government to place under seal for a sixty (60) day period audio tapes admitted into evidence at the sentencing hearing of the defendant, Alfred Carpentier ("Carpentier"). Carpentier has not opposed the motion, but both The New York Times Company, publisher of the New York Times ("the Times"), and the New York News, Inc., publisher of the New York Daily News ("the News"), have opposed the motion on First Amendment grounds and on the basis of the common law right of access to information admitted into evidence at a public hearing. For reasons set forth below, the Government's motion is denied.

## BACKGROUND

The defendant Carpentier along with his co-defendant Alexander Alexandro ("Alexandro") was indicted and found guilty of certain crimes committed in the course of a covert investigation conducted by the Federal Bureau of Investigation ("F.B.I."), commonly known as "Abscam." The main characters in all of the Abscam investigations were Melvin Weinberg ("Weinberg"), a Government informant, and Special Agent Anthony Amoroso of the F.B.I., who in his undercover capacity was known as Tony DeVito ("DeVito").

The evidence at trial showed that Carpentier first met Weinberg in December of 1978, and that the two continued to meet quite frequently in the following months to discuss and negotiate various business transactions. During one of those meetings, Carpentier mentioned that in the past he had dealt with corrupt United States Immigration and Nationalization Service ("INS") inspectors, and that they could no

doubt be of some assistance to Weinberg's and DeVito's employer—the fictitious Arab Sheik who controlled Abdul Enterprises, Ltd., a sham Middle Eastern company ostensibly interested in investing money in the United States.

In a subsequent meeting, Weinberg and DeVito pursued Carpentier's offer. They told Carpentier that their boss, the "Sheik", wanted to assist a friend in obtaining permanent residence status in the United States for the friend's son. The friend and the son were likewise ficticious.

On May 30, 1979, Carpentier met with Weinberg and DeVito to set up the meeting with the INS agent, Alexandro. On May 31, 1979, Carpentier attended a meeting with Alexandro, Weinberg and DeVito to plan the deal. During the following months, the details of a fraudulent immigration transaction were worked out and money was exchanged between the defendants and DeVito and Weinberg. The majority of these transactions were taped with audio and/or video recording devices.

On October 31, 1980, the defendant Carpentier was convicted after a jury trial of conspiracy to commit bribery, 18 U.S.C. § 371 and of conflict of interest. 18 U.S.C. §§ 202, 203. In the conspiracy count, Carpentier was found guilty of conspiring with Alexandro to receive money in return for Alexandro's official misconduct. In the latter, Carpentier was found guilty of aiding and abetting Alexandro in performing acts of official misconduct. As for Alexandro, he was convicted on the same date of the substantive bribery count, 18 U.S.C. § 201(c), the substantive conflict of interest count, 18 U.S.C. § 203, and the conspiracy count, 18 U.S.C. § 371.

The sentencing of both Carpentier and Alexandro was delayed for several months at the request of the defendants to permit the defendants and the court to follow the "due process" hearings then being conducted before the Hon. George C. Pratt of this court. Those hearings, held upon the motion of other Abscam defendants, focused on alleged improprieties committed during the entire Abscam investigation. Judge

Pratt in *United States v. Myers*, et al., 527 F.Supp. 1206 (E.D.N.Y.1981) concluded that there were no such due process violations. Since that decision, neither defendant in this action has pursued any relief on the basis of the due process violations,[1] and sentencing for both defendants was scheduled for September 22, 1981.

On that date, Alexandro was sentenced to a four-year term of incarceration, but Carpentier's sentence was again adjourned to enable the Government to obtain authorization from the Attorney General of the United States to move to close Carpentier's sentencing hearing pursuant to 28 C.F.R. § 50.9. After the sentence was adjourned, the Government furnished the court with approximately six-to-eight hours of tapes which the Government was to admit in evidence at the sentencing hearing. With the understanding that the hearing was to be closed, the court agreed to listen to the tapes *in camera* to expedite the sentencing hearing.

After another adjournment at the Government's request and after some discussion in Washington, D. C. between the press and the Justice Department, the Government informed the press and the court on November 13, 1981 that it would not seek to close the hearing. The sentencing hearing, also known as a *Fatico* hearing, began in open court on November 16, 1981. *See United States v. Fatico*, 579 F.2d 707 (2d Cir. 1978), *remanded*, 458 F.Supp. 388 (E.D.N.Y.), *aff'd*, 603 F.2d 1053 (2d Cir. 1979),[2] *cert. denied*, 444 U.S. 1073, 100 S.Ct. 1018, 62 L.Ed.2d 755 (1980).

Before the *Fatico* hearing again commenced on November 19, 1981, the defendant made a tactical decision not to play the tapes and to bypass examining any witnesses concerning the content of those tapes. The Government then moved to admit the tapes in evidence without playing the tapes in open court. Although the Government had been willing to play the tapes if the defendant sought to challenge their content, it altered that position once it learned that Carpentier had decided to limit his rebuttal case. In short, the Government then asked that the tapes, already admitted in evidence, be placed under seal for sixty days as their disclosure, according to the Government, would jeopardize an ongoing grand jury investigation. At this point, the Times and the News appeared before the court in opposition to the motion.

## CONCLUSIONS

■ The issue before this court is whether to allow the public and press access to tapes admitted into evidence without seal by the Government during a public sentencing hearing. The Supreme Court has enunciated the principle that "[w]hat transpires in the courtroom is public property," *Craig v. Harney*, 331 U.S. 367, 374, 67 S.Ct. 1249, 1254, 91 L.Ed. 1546 (1947). While "access to governmental information is subject to a degree of restraint dictated by the nature of the information and countervailing interests in security or confidentiality," *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 586, 100 S.Ct. 2814, 2832, 65 L.Ed.2d 973 (1980) (Brennan, J., concurring); *see, e. g., Houchins v. KQED, Inc.*, 438 U.S. 1, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978), "[t]he commission of crime, prosecutions resulting from it, and judicial proceedings arising from the prosecutions . . . are . . . events of legitimate concern to the public and . . . fall within the responsibility of the press to report the operations of government." *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 492, 95 S.Ct. 1029, 1044, 43 L.Ed.2d 328 (1975). Accordingly, the court concludes that, on the basis of the growing trend in the Supreme Court, *see Richmond Newspapers, Inc. v. Virginia, supra; Garrett v. DePasquale*, 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979), the public has a strong

---

1. Both defendants did move to dismiss the indictment during the trial, but their joint motion was denied.

2. The purpose of the *Fatico* hearing was to place before the court evidence of the defendant's background, character, and conduct to be taken into consideration at sentencing. *See* 18 U.S.C. § 3577. As with all criminal hearings, the defendant in this adversarial proceeding is given a full opportunity to challenge the evidence submitted by the Government.

First Amendment claim to access to evidence admitted in a public sentencing hearing, see *Richmond Newspapers, Inc. v. Virginia, supra,* and that the tapes should be disclosed.

There is good reason for allowing the public to see and hear evidence offered by the Government in an open hearing which a court is asked to consider when sentencing a convicted defendant. Primarily, there is a basic distrust of secret proceedings. *In re Oliver,* 333 U.S. 257, 273, 68 S.Ct. 499, 507, 92 L.Ed. 682 (1948). In addition, the public must have the opportunity to observe and criticize the judiciary in the operation of its duties. In sentencing, unlike other aspects of criminal proceedings, it is the distinct province of the court to determine what constitutes proper sentence. Nonetheless, the judiciary is an arm of the government, see *Richmond Newspapers, Inc. v. Virginia, supra,* 448 U.S. at 595, 100 S.Ct. at 2838 (Brennan, J., concurring), and if the public is to have access to a criminal trial to be part of the checks and balances in government, *a fortiori* that same check should be present when a court is asked to use its broad discretion and consider evidence admitted in a public hearing in imposing sentence. To the extent that the tapes at issue have become a matter of public record upon their admission into evidence by the Government at a public hearing, the press and the public should be allowed to hear the tapes and should be given access to these tapes. *See United States v. Hubbard,* 650 F.2d 293, 323 (D.C.Cir.1981); *Cianci v. New Times Publishing Co.,* 88 F.R.D. 562 (S.D.N.Y.1980); *cf. United States v. Gurney,* 558 F.2d 1202, 1209 (5th Cir. 1977), *cert. denied sub nom. Miami Herald Publishing Co. v. Krentzman,* 435 U.S. 968, 98 S.Ct. 1606, 56 L.Ed.2d 59 (1978).

The Government argues that the public need not be informed as to the reasons underlying the court's pronouncement of sentence. The Government analogizes the information contained in these tapes to the information often contained in probation reports to which the public is not privy. However, this analogy is inaccurate in light of the adversarial nature of the instant proceeding. This characterization arises from the significant distinction that the probation department which submits its probation report to the court for the purpose of sentencing is part of the judiciary, see Fed.R.Crim.P. 32, whereas, the Government, which has admitted the tapes into evidence in the *Fatico* hearing for the purpose of sentencing is yet an adversary in a judicial hearing arising from its prosecution and conviction of Carpentier. *See Cianci v. New Times Publishing Co., supra.*

There is authority in this Circuit holding that evidence admitted under seal need not be disclosed "because, with respect to that item of evidence, the session of court was not public." *Application of National Broadcasting Co., Inc.* (Myers), 635 F.2d 945, n. 4 (2d Cir. 1980). However, this ruling is not applicable to the instant action. During the *Fatico* hearing, the tapes in issue were admitted into evidence without a seal, so the above holding is not controlling. *See, e. g., National Polymer Products v. Borg-Warner Corp.,* 641 F.2d 418, 421 (6th Cir. 1981). Further, the distinction in the instant case that the tapes were not played during the hearing as in *Myers* is not dispositive in light of the fact that, by the admission of the tapes into evidence without seal, they became part of the public record. *See Cox Broadcasting Corp. v. Cohn, supra,* 420 U.S. at 495, 95 S.Ct. at 1046. Accordingly, the court follows the *Richmond Newspapers* holding and concludes that the public has a First Amendment right to see and hear evidence admitted into evidence in a public sentencing hearing. *Cf. United States v. Hubbard,* 650 F.2d at 330 (MacKinnon, J., dissenting).

■ There is also an additional basis for giving the press and public access to the tapes. The common law right to inspect and copy judicial records is firmly established in our jurisprudence, *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 597–98, 98 S.Ct. 1306, 1311–12, 55 L.Ed.2d 570 (1977), and that right applies to tapes as well as documents. *See In re National Broadcasting Co., Inc.* (Jenrette), 653 F.2d

609 (D.C.Cir.1981); *United States v. Criden*, 648 F.2d 814 (3d Cir. 1981); *Application of National Broadcasting Co., Inc.* (Myers), *supra*. While the decision to release those tapes for copying and reproduction rests in the sole discretion of the trial court, *Nixon v. Warner Communications, Inc., supra*, the presumption is in favor of disclosure.[3]

The court does recognize that under certain circumstances, disclosure would be denied if such disclosure would hamper law enforcement efforts. *See generally United States v. Winner*, 641 F.2d 825, 831 (10th Cir. 1981); *Black v. Sheraton Corp.*, 564 F.2d 531 (D.C.Cir.1977); 28 C.F.R. § 16.1 *et seq.* Under the circumstances of this case, however, that privilege belatedly raised by the Government at the close of the *Fatico* hearing does not override the public's First Amendment right to hear those tapes and does not outbalance the presumption in favor of copying judicial records. *Richmond Newspapers, Inc. v. Virginia, supra*, 448 U.S. at 581, 100 S.Ct. at 2830.

█ Specifically, the Government maintains that disclosure would hamper an ongoing grand jury investigation. While parenthetically this fact alone might justify the sealing, the facts mitigate against nondisclosure. Firstly, the Government has had these tapes since 1978 or 1979 and has done little or nothing to investigate information revealed on the tapes, and the fears expressed regarding the ongoing investigation appear to be based solely on speculation. *See In re Search Warrant For Second Floor Bedroom*, 489 F.Supp. 207 (D.R.I.1980). Secondly, the Government had no reluctance to play the tapes in open court when it believed that Carpentier was going to contest certain facts contained in the tapes.

It was only after Carpentier's position was clear to the Government that it sought to seal the tapes. Finally, the Government had numerous opportunities to discuss the closing of the entire proceeding with the Justice Department in Washington, D. C. and the press had some input in the Justice Department's decision against closing the hearing. It was only at the eleventh hour that the Government sought to alter its position. Taken as whole, these facts detract from the Government's position that disclosure would jeopardize a grand jury investigation. Such frequent changes of heart by the Government to further its position cause this court to view its request with skepticism.[4]

In conclusion, this court has been asked to consider the information on these tapes in sentencing the defendant, and it will do so. However, the court accords no weight to statements made regarding third parties mentioned on the tapes. There is absolutely no proof that the individuals mentioned were involved in illegal activities in any way nor does the Government make any claim regarding the substance of those statements as they pertain to third parties.

Accordingly, the Government's motion is denied.

SO ORDERED.

---

3. By its decision herein, the court does not expand the First Amendment right and the right of access to the extent that the public can examine matter contained in the presentence report. Such disclosure is specifically restricted by applicable statutes. Fed.R.Crim.P. 32. The court's holding pertains solely to the audio tapes admitted into evidence without seal in a public, criminal, adversarial proceeding.

4. On occasion, courts have expressed concern that disclosure may affect innocent third parties mentioned in the evidence. *See United States v. Hubbard, supra; United States v. Criden, supra.* While this is true in any case where a party makes possibly unfounded statements about third parties, under the circumstances, such considerations do not alter this court's decision. As the Second Circuit noted in *Myers, supra*, 635 F.2d at 952, the public has a strong interest in examining every aspect of the controversial Abscam investigation, which would not be outweighed by the interests of third parties who might be mentioned on those tapes.